IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA            )
                                    )
        v.                          )   Criminal No. 05-29
                                    )
SEAN MURPHY                         )

OPINION

On February 8, 2005, a federal grand jury returned a one-count indictment against Sean Murphy ("defendant") charging him with possession of a firearm by a convicted felon in violation of 18 U.S.C. §922(g)(1).   Currently before the court are numerous pretrial motions filed by the defendant.

A motions hearing was held before the court on June 8, 2005, at which time the court ruled from the bench on several of defendant's motions and took under advisement his motion to suppress physical evidence.   A supplemental hearing was held on June 28, 2005, following which the parties were given the opportunity to file supplemental briefs.   These briefs have now been filed.

For the reasons which follow, the defendant's motion to suppress will be granted.

I.   Motions Resolved at Hearings

At the hearing on June 8, 2005, the court ruled on all of the defendant's pretrial motions except his motion to suppress. Specifically, the court indicated it would: (1) grant in part and

deny in part defendant's motion for discovery (Document No. 17) and his motion requesting notice pursuant to Fed. R. Evid. 404, 405, 406, 407 & 408 (Document No. 19); (2) deny as moot defendant's motion for notice by the prosecution of its intention to use evidence arguably subject to suppression (Document No. 20); and, (3) grant defendant's motion for disclosure of impeachment evidence (Document No. 21).

At the supplemental hearing held on June 28, 2005, the court denied defendant's motion for a view (Document No. 27). The court's rulings on motions made at both hearings hereby are adopted as the court's formal and final rulings on those motions for the reasons stated on the record at those hearings. (Transcript of Motions Hearings 2-5; 175-76.)

An appropriate order will follow.


II.   Defendant's Motion to Suppress Physical Evidence

On the night of August 28, 2004, at approximately 10:20 p.m., officers from the Homestead Police Department, assisted by a number of Federal Drug Enforcement Agency ("DEA") task force officers, initiated on Browns Hill Road near the intersection of Beechwood Boulevard in Pittsburgh a traffic stop of a 1988 Mercedes Benz operated by defendant.   The officers conducted the stop based upon information received in a radio bulletin issued by Officer Richard Szurlej and Trooper Michael Schmitt, who reported

2

that they had witnessed defendant's vehicle proceed through a steady red traffic signal on the Homestead High-Level Bridge and continue across the bridge weaving through traffic at a high rate of speed.

When defendant pulled to the side of the road and stopped, his passenger, Tarone Jones, exited the vehicle and fled on foot. The responding officers ordered defendant from the vehicle and onto the ground. A pat-down search of defendant resulted in the seizure of a Taurus .45 caliber firearm, approximately $1,000 in cash and a small bag of marijuana.    Defendant then was placed under arrest.

Defendant's motion to suppress physical evidence (Document No. 18) seeks suppression of all evidence, including the firearm, seized either from his vehicle or from his person in the course of the August 28, 2004, traffic stop.    In addition, at the June 8, 2005, hearing, the court granted defendant's oral motion to amend his suppression motion also to seek exclusion of any statements defendant allegedly made after the stop. (Tr. 16.)    Defendant asserts that the officers lacked probable cause to stop his vehicle because he had not committed any traffic violation justifying the stop and that any evidence seized as a result must be suppressed as the fruit of an illegal stop.

Upon consideration of the testimony received at the hearings held on June 8, 2005, and June 28, 2005, as well as the parties'

3

briefs, the court finds that the government has failed to meet its burden of proving by a preponderance of the evidence that the traffic stop in question was initiated upon probable cause that defendant committed a traffic violation.  Accordingly, the court concludes that any and all evidence, physical or testimonial, obtained as the fruit of that illegal stop must be suppressed.

The Fourth Amendment protects individuals from "unreasonable searches and seizures."  United States Constitution, amend. IV. It is well-settled that the temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" within the meaning of the Fourth Amendment.   Whren v. United States, 517 U.S. 806, 809 (1996).   Accordingly, an automobile stop is subject to the constitutional imperative that it not be "unreasonable" under the circumstances.   Id.

The decision to stop a vehicle is reasonable where the police have probable cause to believe that a traffic violation has occurred.   Id.; United States v. Moorefield, 111 F.3d 10, 12 (3rd Cir. 1997); see also Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977)(a law enforcement officer who observes a violation of state traffic laws is entitled to stop the vehicle that committed the violation).   In order to effectuate a lawful stop of a vehicle, the government is not required to prove an actual violation of Pennsylvania law, rather the government need only prove probable

4

AO 72A
(Rev.8/82)

cause that such a violation occurred. United States v. Davenport, 134 Fed. Appx. 523, 525 (3d Cir. 2005); United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (although actual violation of vehicle code need not be established, a reasonable basis for trooper's belief that the vehicle or driver is in violation is required to validate stop).

Where, as here, the vehicle stop is made in reliance on a police radio request from other officers, a finding that the stop was reasonable is dependent on whether the officers who issued the request had probable cause to believe that a traffic violation had occurred, and not on whether it was reasonable for the stopping officers to have relied on the radio request. United States v. Coward, 296 F.3d 176, 179-80 (3d Cir. 2002); see also Whiteley v. Warden, 401 U.S. 560, 568 (1971) (although police officer may rely on representations of other officers when making arrest, officers requesting assistance must have sufficient information to show probable cause); United States v. Hensley, 469 U.S. 221, 232 (1985) (if flyer or bulletin is issued without reasonable suspicion, stop made in objective reliance upon it violates Fourth Amendment).

As a general rule, the burden is on a defendant who seeks to have evidence suppressed to prove that it was seized illegally.    Johnson, 63 F.3d at 242.    However, once the defendant has established a basis for his motion, e.g., that the

5

search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable. Id.; see also Coward, 296 F.3d at 180 (government bears burden of proving existence of reasonable suspicion justifying a Terry traffic stop). Accordingly, the government bears the burden of proving in this case by a preponderance of the evidence that the stop of defendant's vehicle was reasonable, i.e., that it was based upon probable cause to believe that defendant committed a traffic violation.

As a preliminary matter, in his initial brief and at the hearings, defendant indicated that the sole issue before this court was whether the stop of the vehicle was predicated on probable cause. However, in his supplemental brief, defendant raised for the first time a challenge to the officers' post-stop conduct in ordering defendant from his vehicle at gunpoint, ordering him to the ground and then conducting a pat-down search of his person. Based upon the testimony elicited at the suppression hearings, the court rejects that contention and finds that the post-stop activity of the responding officers was in accordance with the strictures of the Fourth Amendment.

Here, if the traffic stop was proper in the first instance, no reasonable suspicion was required to order defendant out of the vehicle, as an officer executing a traffic stop may exercise reasonable superintendence over the car and its passengers and may

6

order the driver and all passengers out of the vehicle, or order them to remain in the vehicle with their hands in the air, even absent any particularized suspicion. United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004).

Moreover, the court finds nothing improper about the subsequent pat-down search. It is well settled that an officer may pat-down the occupants of a vehicle, and also may conduct a search of the passenger compartment, if he has a reasonable suspicion that the occupants might be armed or dangerous. Bonner, 363 F.3d at 216. The test for conducting a pat-down search is whether a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others was in danger. United States v. Kithcart, 218 F.3d 213, 219 (3d Cir. 2000).

Here, based upon the circumstances of the stop as testified to at the hearing, the responding officers' suspicion that the occupants of the vehicle may have been armed was not unreasonable. The stop was made at night upon a report that the vehicle was traveling at a high rate of speed and weaving through traffic, and, upon pulling over, a passenger immediately leapt from the vehicle and fled.   Moreover, as defendant himself testified, immediately after he stopped, he reached over into the glove compartment, in which, by his own admission, he found a firearm. (Tr. 94-95.)   Based on these circumstances, a reasonably prudent

7

police officer at the scene would have been warranted in a belief that he or others may have been in danger, justifying a pat-down search.[1]

As the conduct of the responding officers was proper, the sole issue before this court is whether the officers who issued the radio bulletin to the responding officers had probable cause to believe that defendant committed a traffic violation. If so, the stop was valid and the evidence seized as a result of that stop is admissible. If , however, there is insufficient evidence that the stop was predicated on probable cause that defendant committed a traffic violation, then the evidence must be suppressed, since the burden of proof is on the government.

Here, the stop of defendant's vehicle ostensibly was for his failure to stop at a steady red traffic control signal[2] in

---

[1]  There was conflicting testimony about whether the gun was found in defendant's waistband, as testified to by the responding officers, or whether it was located in the center console between the driver and passenger seats in the front of the car, as defendant testified.  However, regardless of where it was found, if the stop itself was justified, the subsequent seizure of the firearm was permissible, either as the fruit of a pat-down search or of a search of the passenger compartment, where, even accepting defendant's testimony, it would have been in plain view or within the scope of a reasonable security search.

[2]  The government does not contend that the stop in question was justified upon probable cause to believe that the tinted windows on defendant's vehicle were in violation of 75 Pa.C.S.A. §4524(e), which prohibits the driving of any motor vehicle "with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle." Although Officer Szurlej and Trooper Schmitt both indicated in

8

violation of 75 Pa.C.S.A. § 3112(a)(3).[3]   In order to establish probable cause justifying the stop on that basis, the government called Officer Richard Szurlej and Trooper Michael Schmitt who, on the night in question, were partnered together in an unmarked vehicle as part of a DEA multi-jurisdictional task force.   The defense called defendant and his passenger, Tarone Jones.   The testimony of these four key witnesses[4] is briefly summarized as follows.

At the first hearing on June 8, 2005, the government called Officer Richard Szurlej, a narcotics officer with the Borough of McKees Rocks Police Department who has been deputized as a Federal DEA task force officer.   (Tr. at 31-49.)   Officer Szurlej testified that on August 28, 2004, at approximately 10:20 p.m., he

their testimony that it was the tinted windows that first brought the vehicle to their attention, neither testified either that the windows in fact were in violation of §4524(e), or that they believed the windows were in violation of that section, and neither testified that the windows were the basis for the stop. Instead, both indicated that the sole basis for the stop was defendant's purported failure to stop for the red light.

[3]   75 Pa.C.S.A. §3112(a)(2) provides in pertinent part that "[v]ehicular traffic facing a steady red signal alone shall stop . . . and shall remain standing until an indication to proceed is shown . . . ."

[4] The government also called two additional witnesses at the first hearing, Officer Thomas Dunlevi and Deputy Sheriff James Henssel, both of whom were responding officers to the radio bulletin and were involved in the actual stop and subsequent search and arrest.   Unlike the other four witnesses, neither of these officers actually witnessed the events leading up to the alleged traffic violation, which is the crux of defendant's motion to suppress.

9

and Trooper Michael Schmitt, who were involved in task force operations in Homestead, observed and began to follow a "Mercedes Benz, light in color" (he could not recall specifically the color of the vehicle) with tinted windows traveling on Route 837 (a/k/a 8th Avenue in Homestead) which subsequently turned right onto the Homestead High-Level bridge. (Tr. 32.)

Officer Szurlej could not specifically recall why they had followed the vehicle, but suggested that it may have been the tinted windows.[5] He testified that the officers' vehicle was "maybe three cars behind [defendant's] vehicle" when they turned onto the bridge. (Tr. 33.)

He further testified that defendant drove directly through a standing red light at the first traffic signal on the High-Level bridge which allows traffic from the Waterfront complex onto the bridge. (Tr. 34). Either he or Trooper Schmitt, he could not recall which, radioed to the other units that they had just witnessed a motor vehicle violation. (Id.) He also testified that after the vehicle ran the light, it proceeded at a "very, very high rate of speed" across the bridge. (Id.). He indicated that he and Trooper Schmitt "attempted to catch up" after they got through the light and that they arrived after the stop near

---

[5] Officer Szurlej also mentioned that they had been monitoring a club called High Rollers, a purported distribution site for drugs in that vicinity. However, he later testified that defendant was "not at the High Rollers Club" and that he did not know from where defendant was coming. (Tr. 49.)

10

Beechwood Boulevard.  (Tr. 35.)

On cross-examination, Officer Szurlej indicated that he did not remember if defendant had been traveling behind the police vehicle and passed them after they had pulled over, or if they had been sitting and defendant drove by.  (Id.).    In either event, he reiterated that defendant ended up "about two, three cars in front of us."  (Id.)

Officer Szurlej again reiterated that he could not specifically recall why they had begun following defendant's vehicle, but indicated that there "was probably something more to it" than just the tinted windows, but he did not know what.  (Tr. 36.)  He did not report the incident.  (Id.)  He could not recall whether there were other cars stopped at the light in question, but noted that there was other traffic on the bridge although he did not make a notation of traffic. (Tr. 37.)   He also could not recall if he saw the license plate number of the vehicle (Tr. 39.)

Officer Szurlej also testified that traffic was "bottle necked" as he and Trooper Schmitt attempted to make their way in pursuit of defendant's vehicle and later noted that there were cars "in front of us and cars behind us." (Tr. 40.)   He later clarified that he had meant that traffic was bottle necked at the top of the hill where the stop was in progress.  (Tr. 41.)

Upon examination by the court, Officer Szurlej again noted that defendant had accelerated through the red light and across

11

the bridge at such a high rate of speed that he did not think that defendant would be caught. (Tr. 44.). He reiterated that he was unsure if there was "something else" about defendant's vehicle that raised his suspicion beyond the tinted windows. (Tr. 46.) He also testified that although he witnessed the traffic offense, he did not have any authority to enforce Pennsylvania traffic violations, although Trooper Schmitt did. (Tr. 46-47.)

Also at the hearing on June 8, 2005, the defense called defendant to the stand to testify as to the events of August 28, 2004. (Tr. at 85-115.) Defendant testified that on the evening in question he was driving a 1988 Mercedes Benz owned by his mother. (Tr. 88.) Around 10:00 p.m. or 10:15 p.m. that evening, he picked up the vehicle at the home of his son's mother, Jackie Brown, who had borrowed the car earlier that day. (Id.) He testified that he had driven a rental car to Jackie Brown's to pick up the Mercedes because he wanted to go out that evening in a nice car. He was accompanied by his cousin, Tarone Jones, whom he had picked up prior to the vehicle exchange, (Tr. 89,) and that he and Jones had planned to go to Art's Tavern in the Strip District. (Tr. 90.)

Defendant further testified that after picking up the Mercedes he was traveling down Eighth Avenue in Homestead and stopped at a red light at Eighth and Ann, where he noticed a red SUV on his right with officers surrounding it with weapons drawn.

12

(Tr. 90-91.) When the light turned green, he drove to the next intersection at Eighth and Amity, where he also stopped at a red signal, then proceeded to the next light, where he also was stopped by a red light. (Tr. 91.) When that light turned green, he made a right turn onto the High Level Bridge and got into the left-hand lane, where he got behind "two or three" cars that were stopped at the light at the intersection with a ramp coming up from the Waterfront Mall (Tr. 92.) He testified that when that light changed, he followed traffic to the next light, which also was green, then, as he approached a Wendy's restaurant, he looked in the rear view mirror and noticed several police cars with their lights flashing coming across the bridge. (Tr. 92.) As he approached the light near Beechwood, he pulled over, at which time his passenger jumped out of the stopped vehicle and ran. (Tr. 94.)

Defendant further testified that there was "a lot" of traffic on the bridge in both lanes that night and that he was not traveling at a high rate of speed. (Tr. 97.) He reiterated that he ran no red lights at any time. (Id.) The other defense witness called at the June 8, 2005, hearing, defendant's passenger, Tarone Jones, corroborated defendant's testimony in all material respects. (Tr. 69-84.)

At the supplemental hearing on June 28, 2005, the government called Trooper Michael Schmitt of the Pennsylvania State Police,

13

who testified that he was involved in the events of August 28, 2004, as part of a multi-jurisdictional task force effort. (Tr. 140.) He stated that around 10:20 p.m. on that night he was in an unmarked undercover car with Officer Szurlej heading westerly when he noticed a grayish Mercedes Benz, also heading westerly, make a right hand turn onto the High Level Bridge. (Tr. 140-41.)

He indicated that he was directly behind the Mercedes as they turned onto the bridge and that the Mercedes proceeded directly through a steady red light at the intersection of the ramp from the Waterfront Mall. (Tr. 141.) He said that he radioed to marked units ahead, giving a description of the vehicle and the license plate number. (Id.) He testified that after running the red light, the vehicle "proceeded then at a rather increased rate of speed across the bridge, and changing lanes frequently from left to right." (Tr. 142.) He indicated that defendant was in the right hand lane when he observed the violation. (Tr. 142.) He noted that defendant was not speeding "excessively", just quicker than the other traffic, and repeated that he was weaving through the other traffic on the bridge. (Tr. 143.) Later, he testified that "[i]t was Saturday night, 10:30 in the evening; a lot of traffic." (Tr. 144.)

Officer Schmitt testified that he first got behind defendant's vehicle two or three blocks before they turned right onto the bridge (Tr. 150.) and that he was right behind it, with

14

no cars in between (Tr. 151.) He indicated that he "wasn't following it", rather defendant just happened to be in front of him going in the same direction. (Tr. 151.)

He further testified that he did not take defendant's license plate number until the moment defendant ran the red light and took off. (Tr. 152.) He testified that he did not know how fast defendant's vehicle actually was going and that "the traffic was heavy" on the bridge. (Tr. 153.) But he also reiterated that defendant was able to make his way from the right lane to the left lane and back to the right. (Tr. 154.)

He testified that the Mercedes was grayish blue and unequivocally indicated that it was not brown or beige. (Tr. 154.) Trooper Schmitt testified that all of the windows were closed. (Tr. 155,) and that the tinted windows aroused his suspicion. (Tr. 155-56.) He also indicated on cross that he was looking at the registration plate as soon as they got behind defendant's vehicle because he always looks at the registration plates of vehicles in front of him. (Tr. 156-57.) He reiterated that he was directly behind defendant's vehicle and that there were not two cars between defendant's and his. (Tr. 157.)

It is also significant to note that on cross examination, Trooper Schmitt acknowledged that the police arrest report from that evening reported only that defendant was driving erratically, it made no mention of him running a red light, although that was

15

the purported basis for the stop and the subsequent arrest that was being reported.  (Tr. 147-48.)

The government bore the burden of proof in this matter.  At the hearings, four witnesses testified as to the events culminating in the traffic stop at issue.  Not only was the testimony of the government witnesses and the defense witnesses in diametric conflict, as one might expect, there were as indicated above several significant inconsistencies within the testimony and evidence offered by the government.  The outcome of the suppression motion, therefore, will turn on the credibility of these witnesses, which we consider below.

The court, as finder of fact, is free to accept or reject any or all of a witness's testimony.  <u>United States v. Conley</u>, 859 F.Supp. 830 (W.D. Pa. 1994).  Credibility determinations are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic.

When a defendant takes the stand to testify, his credibility is to be judged in the same way as any other witness.  <u>United</u>

16

States v. Morrone, 502 F.Supp. 983, 991 (E.D. Pa. 1980). Likewise, the testimony of a witness is not to be judged more or less credible because the witness is a law enforcement officer. See, e.g. United States v. Bethancourt, 65 F.3d 1074, 1080 (3d Cir. 1995) (viewing favorably use of jury charge instructing that testimony of law enforcement officer not necessarily entitled to any more, or any less, weight than any other witness); Conley, 859 F.Supp. at 840 (government witnesses are not *per se* credible or even presumed to be credible).

With these concepts in mind, the court finds Officer Szurlej's testimony to be less than credible primarily because he appeared to have a great deal of difficulty recalling anything but the most general details regarding the evening in question. His testimony was peppered with qualifications and he answered a large number of questions with responses indicating that he could not specifically recall or that he did not remember. For instance, Officer Szurlej could not specifically recall the color of defendant's vehicle, why they were following it, if it was he or Trooper Schmitt who radioed the bulletin, whether he ever saw the license plate number of the Mercedes, how much traffic was on the bridge or whether there were cars in front of defendant at the light in question.

In addition, there were inconsistencies in Officer Szurlej's testimony which did not comport with the testimony of other

17

witnesses, notably including Trooper Schmitt.   Most glaringly, Officer Szurlej testified that the unmarked car in which he and Trooper Schmitt were riding was two or three cars behind defendant's vehicle when they turned onto the bridge and at the traffic signal in question, whereas Trooper Schmitt testified that he and Officer Szurlej were directly behind defendant's vehicle.

Moreover, Officer Szurlej testified that defendant proceeded through the red light and accelerated across the bridge at "a very, very high rate of speed", to such an extent that Officer Szurlej believed it would not be possible to catch him. Conversely, Trooper Schmitt, noting the heavy traffic on the bridge, testified that defendant was not speeding "excessively", rather he merely was moving faster than other traffic, and he made no mention of Officer Szurlej's purported exclamation that defendant could not be caught.

Officer Szurlej's inability to recollect so many of the most salient factors involved in the traffic stop, as well as the inconsistencies in his testimony, all serve to reflect negatively on the credibility of his testimony.[6]   Accordingly, the court

---

[6]It should be emphasized that this court's credibility determination with regard to Officer Szurlej in no way is meant to impugn his character or to suggest that he was less than truthful in his testimony.   It simply recognizes that his testimony was rendered less believable because of the inconsistencies noted and his inability to recall some of the critical details of one event in an evening tour of duty ten months earlier. See, e.g., United States v. Randolph, 456 F.2d 132, 135 (3d Cir. 1972)(testimony to be believed must not only proceed from the mouth of a credible

18

finds Officer Szurlej's testimony to be less than credible.

Conversely, the court for the most part found defendant's testimony, particularly as it relates to the circumstances surrounding the alleged traffic violation, to be believable.[7] In rendering this determination, the court has taken into account defendant's demeanor on the stand, his apparently strong recollection of the night's events, the fact that, even upon vigorous and effective cross-examination by the Assistant United States Attorney, his version of the events of that evening never wavered, and the fact that his testimony regarding the events leading to the stop was corroborated in all significant details by Tarone Jones.

The court also has considered defendant's obviously immense interest in the outcome of the proceeding. Defendants in criminal cases always have much riding on the outcome and that is a legitimate matter to factor into an evaluation of the credibility of any defendant's testimony. However, it would be manifestly

witness, but must be credible in itself.)

[7] This is not to suggest that the court accepted as credible defendant's testimony in toto or that the court is unmindful of the principle that a trier of fact may reject all of the testimony of a witness who has testified falsely as to a material matter, but it is not obliged to and may accept other parts of the testimony of such a witness. Here, defendant's explanation that the $1,000 he was carrying at the time of the stop was from his landscaping business appears to be less than truthful. But the testimony relating to the cash had little to do with the critical issue before the court, that is to say it was not material on the question of whether the defendant committed a traffic violation.

19

unfair and highly improper for that overtly or subliminally to be the determinative factor in judging a defendant's testimony. All of the circumstances must be considered and a credibility determination arrived at based on reason and logic. Based on a consideration of all of the relevant factors before the court, including the testimony of the officers, the traffic conditions at the scene, the testimony of defendant's passenger and the factors listed above, the court finds the defendant's testimony reasonable.

Which leaves the court with the testimony of Trooper Schmitt. On the one hand, Trooper Schmitt's recollection of the events in question appeared to have been stronger than that of Officer Szurlej. He was much more authoritative in his responses and answered most of the questions unequivocally with no qualifications. His demeanor and his ability to recollect the events in question weigh positively on his credibility.

However, in assessing credibility, the court also is required to look at the consistency of a witness's testimony with that of other witnesses. In this regard, it is clear that Trooper Schmitt's testimony was inconsistent in numerous ways, not only internally and with that of the defendant, but also with the testimony of other witnesses, including Officer Szurlej and one of the responding officers.

First, Trooper Schmitt was the only one of the four witnesses

20

present during the alleged violation to testify that defendant, after purportedly running the red light, proceeded across the bridge by driving "erratically", weaving in and out of traffic and frequently changing lanes.    Officer Szurlej made no mention of erratic driving.    The testimony of Trooper Schmitt and defendant conflicted even as to which lane defendant was in when he first turned onto the bridge, with defendant indicating he was in the left hand lane at the light and Trooper Schmitt indicating they were in the right hand lane.    Officer Szurlej did not testify on this point.

Trooper Schmitt's testimony as to frequent lane changes at an increased rate of speed also seems to be somewhat inconsistent with his later testimony that traffic on the bridge was heavy. Finally in this regard, as observed earlier, the court also finds it noteworthy in assessing Trooper Schmitt's credibility that the very police arrest report he completed for the incident in question, which one would expect at a minimum would report the basis for the stop leading to the arrest, mentioned only erratic driving and made no mention of a traffic signal violation.

Trooper Schmitt's testimony also was internally inconsistent on another point.        Trooper Schmitt first testified that defendant's Mercedes caught his eye while they were both traveling westerly on Eighth Avenue and that he followed it when it made a right hand turn onto the bridge.    The basis for his suspicion was

21

the tinted windows. Later, on cross, however, he testified that he was not following defendant's car, he just happened to be behind it. Later again on cross, he then noted that he took notice of defendant's registration plate as soon as he got behind him, or three blocks before the bridge, which was somewhat inconsistent with his earlier testimony that he did not take defendant's license plate number until right at the moment that defendant ran the red light.

Trooper Schmitt's testimony not only was at variance in certain particulars with Officer Szurlej's and with defendant's, but also with the testimony of the responding officers. In particular, unlike defendant, who testified that all four windows on the Mercedes were open, and unlike DEA Task Force Officer Thomas Dunlevi, who testified that the driver's side window was down (Tr. 12,) Trooper Schmitt testified that all of the windows were closed. (Tr. 155.) While all of the foregoing inconsistencies may appear trivial in isolation, as a whole they do influence a determination of credibility.

In the final analysis, the court is faced with weighing the testimony of Officer Szurlej, whose inability to recollect the details of the stop render him less than credible; the testimony of defendant, an interested but nevertheless credible witness whose testimony was corroborated by Tarone Jones; and the testimony of Officer Schmitt, whose otherwise credible testimony

22

was diminished by contradictions and inconsistencies with the testimony of numerous other witnesses.

Under these circumstances, the court finds that the government has failed to meet its burden in this case to prove by a preponderance of the evidence that there was probable cause to believe that defendant committed a traffic violation by failing to stop at the red light in question on the night of August 28, 2004. As a result, the court finds that the traffic stop violated the Fourth Amendment and that the evidence seized as a result of that unlawful stop must be suppressed pursuant to the exclusionary rule. See, e.g., United States v. Zimmerman, 277 F.3d 426, 436 (3d Cir. 2002) (exclusionary rule bars admission of evidence seized as result of unconstitutional search and seizure and is designed to deter police conduct that violates constitutional rights of citizens); United States v. Herrold, 962 F.2d 1131, 1137 (3d Cir. 1992) ("fruit of the poisonous tree" doctrine requires exclusion of tangible evidence seized during an unlawful search as well as derivative evidence, both tangible and testimonial, acquired as a result of the unlawful search). Accordingly, defendant's motion to suppress will be granted.

An appropriate order will follow.

Gustave Diamond
United States District Judge

23

cc: Soo C. Song
    Assistant U.S. Attorney

    Gary B. Zimmerman, Esq.
    100 Ross Street, Suite 200
    Pittsburgh, PA   15219

24